1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    CURTIS MILLER                              Case No. 1:20-cv-01243-KES-HBK (PC)

12                     Plaintiff,                FINDINGS AND RECOMMENDATIONS TO
                                                 GRANT DEFENDANTS' MOTION FOR
13          v.                                   SUMMARY JUDGMENT[1]

14    FAYE MONTEGRANDE AND OLUFEMI
      OWALBI,                                    FOURTEEN-DAY OBJECTION PERIOD
15
                     Defendants.                 (Doc. No. 45)
16

17

18          Pending before the Court is Defendants' Motion for Summary Judgment.  (Doc. No. 45,

19    "MSJ").  For the reasons set forth below, the undersigned finds that no genuine dispute of

20    material fact exists as to whether Defendants acted with deliberate indifference to Plaintiff's

21    serious medical condition.  Therefore, the Court recommends that Defendants' MSJ be granted

22                                    **I. BACKGROUND**

23       **A. Procedural History and Allegations in Operative Complaint**

24          On September 2, 2020, Plaintiff initiated this action while confined at California

25    Department of Corrections and Rehabilitation ("CDCR") alleging an Eighth Amendment deliberate

26    indifference claim against Defendants Dr. Montegrande, Dr. Owolabi, and Dr. Baniga in their

27    _____

28    [1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302
      (E.D. Cal. 2023).

1    individual capacities and an official capacity claim against Defendant Warden Cates.  (Doc. No. 1).

2    By way of background, in December 2015 while at his prior institution Plaintiff was advised that

3    "the nodules in the soles of his feet were likely Morton's neuroma or ganglion cyst," so he agreed

4    to try orthotic boots and insoles, instead of other treatment options such as anti-inflammatory drugs,

5    steroid injections, and surgery; orthotic boots and insoles were made permanent.  (*Id.* at 8 ¶¶ 2-3,

6    unedited).   In November 2017, his former primary care provider ordered new orthotic shoes and

7    insoles for him.  (*Id.* at 8 ¶ 4).

8         On February 19, 2019, Plaintiff was transferred to California Correctional Institution "CCI"

9    prior to receiving his new orthotics.  (*Id.* at 8 ¶ 5).  During an initial visit with his new primary care

10    physician, Defendant Owolabi, Plaintiff informed him that he was still awaiting his replacement

11    orthotics and because of this year-plus delay, he was suffering severe pain and the condition with

12    his feet was worsening.  (*Id.* at 8 ¶ 6).  Defendant Owolabi agreed to look into it.  (*Id.*).

13         On July 7, 2019, Plaintiff filed an inmate health care appeal, complaining that his repeated

14    requests for replacement orthotics had not been addressed.  (*Id.* at 8 ¶ 7).  On August 9, 2019,

15    Plaintiff was seen by Defendant Montegrande, a physician and surgeon, regarding his appeal.  (*Id.*

16    at 8-9 ¶ 8).  Dr. Montegrande looked at Plaintiff's feet and informed him that he did not meet the

17    criteria for orthotics because he was not diabetic and was not missing any toes.  (*Id.*)  On August

18    22, 2019, nonparty Dr. Baniga, chief physician and surgeon, denied Plaintiff's appeal.  (*Id.* at 9 ¶

19    9).  Plaintiff appealed the denial and while it was pending, he was seen again by Dr. Owolabi and

20    again requested replacement orthotics.  (*Id.* at 9 ¶ 11).

21         In denying Plaintiff's request, Dr. Owolabi informed him that the facility was not issuing

22    custom orthotics unless a prisoner was diabetic or missing toes because CDCR's new regulations

23    required CDCR to bear the cost of them, as opposed to the prisoner, as under former regulations.

24    (*Id.*).  On October 28, 2019, Plaintiff's appeal was denied at headquarters' level review.  (*Id.* at 9

25    ¶ 12).  Plaintiff contends his continued requests for replacement orthotic boots are being denied,

26    and that as a result, he continues to suffer severe pain and his condition is worsening, including

27    injury to his right calf, knee, and hip, causing him further pain and the inability to stand for

28    periods longer than five minutes.  (*Id.* at 9 ¶ 13).

2

1    The Court found the Complaint alleged an Eighth Amendment medical deliberate

2    indifference claim against Defendants Dr. Montegrande, Dr. Owolabi, and Dr. Baniga in their

3    individual capacities stemming from their failure to authorize replacement custom orthotic shoes

4    and custom insoles to treat Plaintiff's foot pain and an official capacity claim against Defendant

5    Warden Cates to the extent that Plaintiff sought injunctive relief concerning CDCR's orthotics

6    policy but no other claims.  (Doc. No. 10).  Plaintiff agreed to proceed on his Complaint as

7    screened.  (Doc. No. 11).  The Court then directed service and Defendants agreed to waive

8    personal service but sought extensions of time to respond to the Complaint, which the Court

9    granted.  (Doc. Nos. 13, 16, 17, 18, 21, 22).

10    Prior to the date Defendants were required to file a response to the Complaint, Plaintiff

11    filed a notice of change of address indicating he was released from CDCR's custody.  (Doc. No.

12    19).  On November 3, 2022, Defendants moved to dismiss the claims against Dr. Baniga and

13    Warden Cates.  (Doc. No. 23).  Plaintiff did not file an opposition.  (*See* docket).  On August 31,

14    2023, the Court issued its Findings and Recommendations, recommending that Defendants'

15    partial motion to dismiss be granted.  (Doc. No. 30).  On October 25, 2023, the assigned District

16    Judge adopted the Court's Findings and Recommendations and dismissed the claims against Dr.

17    Baniga and Warden Cates.  (Doc. No. 31).  On November 8, 2023, the remaining defendants, Dr.

18    Owolabi and Dr. Montegrande, answered Plaintiff's Complaint.  (Doc. No. 32).  On May 21,

19    2025, Defendants filed the timely instant MSJ.  (Doc. No. 45).

20    **B.  Defendants' MSJ**

21    Supporting their MSJ, Defendants submit: (1) a memorandum of points and authorities

22    (Doc. No. 45-1); (2) a statement of undisputed material facts (Doc No. 45-2); (3) the declaration

23    of Joseph J. Railey (Doc. No. 45-3); (4) the declaration of  F. Montegrande (Doc. No. 45-4); (5)

24    the declaration of M. Lotersztain[2] (Doc. No. 45-5); and (6) the declaration of O. Owolabi (Doc.

25    No. 45-6).

26    ―――――――――――――――

27    [2] M. Lotersztain employed by the California Correctional Health Care Services ("CCHCS") as the Chief Medical Executive at California Correctional Institution ("CCI") in Tehachapi, California. I have been licensed to practice medicine in California since June 2005 and am board certified in internal medicine.

28    (Doc. No. 45-5, ¶ 1).

3

### C.  Plaintiff's Opposition to Defendants' MSJ

Plaintiff filed no opposition to Defendants' MSJ.  (*See* docket).  Defendants served the MSJ on Plaintiff by First-Class Mail.  (Doc. No. 45-8 at 1-2).  The deadline for Plaintiff to file any opposition has long expired.  *See* Local Rule 230(l) (E.D. Cal. 2023).

## II.  APPLICABLE LAW

### A.  Summary Judgment Standard

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact.  *Id.* at 323.  An issue of material fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there to be a genuine issue of a material fact.  *See* Fed R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586.  An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 587.  The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exists.  Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11.  The opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."

4

1   *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir.

2   1987).  However, "failure of proof concerning an essential element of the nonmoving party's

3   case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.

4       The court must apply standards consistent with Rule 56 to determine whether the

5   moving party demonstrated there is no genuine issue of material fact and showed judgment to be

6   appropriate as a matter of law.  *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).

7   "[A] court ruling on a motion for summary judgment may not engage in credibility

8   determinations or the weighing of evidence."  *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir.

9   2017) (citation omitted).  The evidence must be viewed "in the light most favorable to the

10   nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving

11   party.  *Orr v. Bank of America*, NT & SA, 285 F.3d 764, 772 (9th Cir. 2002).  A mere scintilla

12   of evidence is not sufficient to establish a genuine dispute to defeat an otherwise properly

13   supported summary judgment motion.  *Anderson.*, 477 U.S. at 252.  However, where "opposing

14   parties tell two different stories, one of which is blatantly contradicted by the record" courts

15   "should not adopt that version of the facts for purposes of ruling on a motion for summary

16   judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

17       Plaintiff's verified complaint may serve as an affidavit in opposition to summary

18   judgment if based on personal knowledge and specific facts admissible in evidence.  *Lopez v.*

19   *Smith*, 203 F.3d 1122, 1132 n. 14 (9th Cir. 2000) (en banc).  However, a complaint's conclusory

20   allegations unsupported by specific facts, will not be sufficient to avoid summary judgment.

21   *Arpin v. Santa Clara Valley Transportation Agency*, 261 F.3d 912, 922 (9th Cir. 2001).  And,

22   where a plaintiff fails to properly challenge the facts asserted by the defendant, the plaintiff may

23   be deemed to have admitted the validity of those facts.  *See* Fed. R. Civ. P. 56(e)(2).

24       The undersigned has carefully reviewed and considered all arguments, points and

25   authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any,

26   objections, and other papers filed by the parties.  The omission to an argument, document, paper,

27   or objection is not to be construed that the undersigned did not consider the argument, document,

28   paper, or objection.  Instead, the undersigned thoroughly reviewed and considered the evidence it

1  deemed admissible, material, and appropriate for purposes of issuing these Findings and

2  Recommendations.

3        **B. Eighth Amendment Medical Deliberate Indifference**

4        The Constitution requires prison officials to provide inmates with reasonably adequate

5  medical care.  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  To hold an official liable for violating

6  this duty under the Eighth Amendment, the inmate must satisfy two prongs, an objective prong

7  and subjective prong.  First, the inmate must suffer from a serious medical need (the objective

8  prong); and second the official must be deliberately indifferent to the inmate's serious medical

9  need (the subjective prong).  *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in*

10 *part on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076, 1082–83 (9th Cir. 2014); *Wilhelm v.*

11 *Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012).  A medical need is "serious" if the failure to treat

12 "could result in further significant injury or the unnecessary and wanton infliction of pain."  *Jett*

13 *v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations omitted).  The "second prong—

14 defendant's response to the need was deliberately indifferent—is satisfied by showing (a) a

15 purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm

16 caused by the indifference."  *Id*. (internal citations omitted).  This standard requires that the

17 prison official must not only "be aware of facts from which the inference could be drawn that a

18 substantial risk of serious harm exists," but that person "must also draw the inference."  *Farmer v.*

19 *Brennan*, 511 U.S. 825, 837 (1994).  "If a [prison official] should have been aware of the risk, but

20 was not, then the [official] has not violated the Eighth Amendment, no matter how severe the

21 risk."  *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1188 (9th Cir. 2002).  This

22 "subjective approach" focuses only "on what a defendant's mental attitude actually was."

23 *Farmer*, 511 U.S. at 839.

24       Deliberate indifference is a higher standard than medical negligence or malpractice, and a

25 difference of opinion between medical professionals—or between a physician and the prisoner—

26 generally does not amount to deliberate indifference.  *See generally Toguchi v. Chung*, 391 F.3d

27 1051 (9th Cir. 2004); *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (A mere "difference

28 of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference.").

To prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment "was medically unacceptable under the circumstances," and was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson*, 90 F.3d at 332.

Neither will an "inadvertent failure to provide medical care" sustain a claim. *Estelle*, 429 U.S. at 105. Misdiagnosis alone is not a basis for a claim, *see Wilhelm*, 680 F.3d at 1123, and a "mere delay" in treatment, "without more, is insufficient to state a claim of deliberate medical indifference," *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). Instead, a prisoner must show that a delay "would cause significant harm and that defendants should have known this to be the case." *Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002).

### III. ANALYSIS

#### A. Plaintiff's Failure to Oppose the Motion

Plaintiff did not file an opposition to Defendants' MSJ, (*see* docket), nor did Plaintiff submit a separate statement of undisputed facts as required by Local Rule 260(a). Where a party fails to oppose a motion for summary judgment, "Rule 56 is clear that although a court *may* deem facts admitted in the exercise of its discretion, it need not do so." *Warkentin v. Federated Life Ins. Co.*, 594 F. App'x 900, 902–03 (9th Cir. 2014) (alteration in original); *see* Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment ("[T]he court may choose not to consider [a] fact as undisputed, particularly if the court knows of record materials that show grounds for genuine dispute"). A court, however, is not authorized to automatically grant summary judgment to a defendant solely because a plaintiff fails to oppose the motion. *Cristobal v. Siegel*, 26 F.3d 1488, 1494–95 & n.4 (9th Cir. 1994); *Martinez v. Stanford*, 323 F.3d 1178, 1182 (9th Cir. 2003).

Where, as here, a party does not challenge the facts asserted by the moving party, the non-moving party may be deemed to have admitted the validity of those facts. *See* Fed. R. Civ. P. 56(e)(2). Further, Local Rule 230(l) provides that the "[f]ailure of the responding party to file an opposition or to file a statement of no opposition may be deemed a waiver of any opposition to the granting of the motion and may result in the imposition of sanctions." Thus, the Court may grant Defendants' unopposed motion for summary judgment if the supporting papers are themselves

1    sufficient to warrant granting the motion and do not on their face reveal a genuine issue of material

2    fact. *See Gill Indus.*, 983 F.2d at 950.

3        **B. Undisputed Material Facts**

4        Defendants provide a statement of undisputed material facts. (Doc. No. 45-2). Each

5    listed fact cites to sworn declarations, deposition testimony, and the Complaint. (*See* generally

6    *id.*). Having reviewed the record, the undersigned finds the following facts to be material and

7    undisputed, unless otherwise noted.

8    • Plaintiff is a formerly incarcerated individual. (Doc. No. 45-3 at 10-29, Miller Depo. Tr. at

9        19:18-23).[3]

10   • From February 2019 until his release on parole in January 2022, Plaintiff was incarcerated

11       at California Correctional Institution ("CCI") in Tehachapi, California. (Miller Depo. Tr.

12       at 22:11-16).

13   • Defendants O. Owolabi and F. Montegrande are medical doctors. In 2019, both

14       Defendants were employed as primary care providers by California Correctional Health

15       Care Services ("CCHCS") at CCI. (Doc. No. 45-6 at 1 ¶ 1; Doc. No. 45-4 at 1 ¶ 1).

16   • CCHCS is responsible for providing medical, dental, and mental health care to the

17       incarcerated population at prisons operated by the California Department of Corrections

18       and Rehabilitation ("CDCR"). Each time an inmate patient sees a CCHCS provider, a

19       record of the visit is generated. (Doc. No. 45-6 at 1 ¶ 1; Doc. No. 45-4 at 1 ¶ 1; Doc. No.

20       45-5 at 1-2 ¶ 1; Miller Depo. Tr. at 54:8-11).

21   • While housed at California State Prison, Los Angeles County, on December 10, 2015,

22       Plaintiff was prescribed custom orthotic shoes and custom orthotic insoles by Dr. A. Chen

23       as treatment for painful nodules in the soles of his feet that were likely caused by

24       Morton's neuroma, a condition where a nerve becomes thickened and swollen and can

25       cause pain or numbness in the ball of the foot. (Doc. No. 45-5 at 3-4 ¶ 9; Miller Depo. Tr.

26       at 35:23-25, Doc. No. 45-3 at 47).

27   —————————————————

28   [3] The Court refers throughout this Order to the complete deposition transcript lodged with the Court
     pursuant to Local Rule 133(j).

- While custom orthotic shoes and custom orthotic insoles are a possible treatment for Morton's neuroma, they are not the only treatment option.  Other treatments options include wearing wider shoes, applying padding in the form of gauze between toes to reduce pressure, steroid injections, physical therapy, and NSAID pain medication.  (Doc. No. 45-5 at 3-4 ¶ 9).

- On March 29, 20216, Plaintiff received the custom orthotic shoes and custom orthotic insoles. (Miller Depo. Tr. at 34:2-5).

- Plaintiff's March 2016 custom orthotic shoes and custom orthotic insoles cost $542.00, and the cost was paid by the state as Plaintiff was indigent.  (Miller Depo. Tr. at 41:8-11, Doc. No. 45-3 at 78).

- On November 2, 2017, while still housed at California State Prison, Los Angeles County, Plaintiff's primary care provider, Dr. J. Lee, placed an order for replacement custom orthotic shoes and custom orthotic insoles for Plaintiff.  (Miller Depo. Tr. at 43:8-18; Doc. No. 45-3 at 146-155, 157-158).

- On December 19, 2017, Plaintiff received replacement custom orthotic shoes and custom orthotic insoles.  At that time, Plaintiff elected to receive custom orthotic boots instead of custom orthotic tennis shoes.  (Miller Depo. Tr. at 46:7-22, 47:12-14; Doc. No. 45-3 at 80-81).

- Plaintiff's December 2017 custom orthotic shoes and insoles cost $529.96, and the cost was paid by the state because Plaintiff was indigent.  (Miller Depo. Tr. at 47:24-48:7; Doc. No. 45-3 at 80-81).

- On October 1, 2018, while still housed at California State Prison, Los Angeles County, Plaintiff was issued, and accepted, replacement insoles for his custom orthotic shoes. (Doc. No. 45-3 at 83).

- The provision of durable medical equipment, including custom orthotic shoes and custom orthotic insoles, to inmate patients is governed by the California Code of Regulations, Title 15 §§ 3999.390-3999.396.  (Doc. No. 45-5 at 2 ¶ 3).

- CCHCS can only provide durable medical equipment when it is medically necessary and

9

appropriate.  (Doc. No. 45-5 at 2 ¶ 3; Doc. No. 45-4 at 2 ¶ 4).

- Under the CCHCS Health Care Department Operations Manual ("HCDOM"), treatment is medically necessary when the treatment is determined by a primary medical provider "to be needed to protect life, prevent significant illness or disability, or alleviate severe pain and are supported by health outcome data or clinical evidence as being an effective health care service for the purpose intended . . . . ." (Doc. No. 45-5 at 2 ¶ 3, 34).

- To assist doctors in determining when equipment is medically necessary, CCHCS has specific and medically appropriate criteria for determining when equipment is medically necessary. Under CCHCS's medically appropriate criteria, custom orthotics are medically necessary when there is some intolerance to prefabricated orthotics or when an incarcerated person has a diagnosis of specific medical conditions. These conditions include some diabetic patients and certain vascular and neuropathic conditions including previous ulceration, diabetes, buerger's disease, chronic thrombophlebitis, and peripheral neuropathies.  Custom orthotics are necessary to treat these conditions as these illnesses require additional foot support to prevent further complications to a patient's vascular and neurological systems.  Custom orthotics may also be medically necessary as postsurgical or post-traumatic casting care or as prosthetic shoes for individuals missing all or part of their feet.  (Doc. No. 45-5 at 2 ¶¶ 3-4; Doc. No. 45-4 at 2 ¶ 4, 6-9).

- Under CCHCS medically appropriate criteria, Morton's neuroma did not qualify as a condition warranting therapeutic footwear.  Notably custom orthotics are not necessary to treat Morton's neuroma because there are other treatment options available, and because it does not present a risk of life-threatening complications to the patient.  (Doc. No. 45-5 at 3-4 ¶ 9).

- Each time an inmate patient requests orthotics; CDCR's policy requires that they should be evaluated to determine whether the orthotics are medically necessary.  This evaluation should occur for both an initial referral for orthotics as well as prior to each referral for replacement orthotics.  As result of this ongoing evaluation, a "permanent" chrono for orthotics, can be canceled at any time based on changes to the patient's medical needs.

10

1  (Doc. No. 45-5 at 4 ¶ 10).

2  • Depending on an incarcerated person's custody level, they can purchase therapeutic shoes

3  or insoles and wear those shoes/insoles in certain areas of the prison.  Additionally, an

4  incarcerated person can request wider state-issued shoes from custody staff.  However,

5  despite these options, incarcerated people often attempt to obtain prescribed custom

6  orthotic shoes and insoles from CCHCS as they can wear medically authorized shoes

7  anywhere in the prison and because they would not have to purchase the orthotic footwear

8  themselves.  (Doc. No. 45-5 at 3 ¶ 7).

9  • In February 2019, Plaintiff transferred to CCI.  (Miller Depo. Tr. at 22:11-13).

10  • Upon his arrival at CCI, Plaintiff's primary care provider was Dr. David Nege.  (Doc. No.

11  45-6 at 2 ¶ 5; Doc. No. 45-3 at 32-33).

12  • On March 8, 2019, shortly after he arrived at CCI, Plaintiff was evaluated by Nurse

13  Practitioner Thomas for a new inmate evaluation.  (Doc. No. 45-6 at 2 ¶ 6; Doc. No. 45-3

14  at 35-36).

15  • A new inmate evaluation occurs when an incarcerated person transfers to a new

16  institution. (Doc. No. 45-6 at 2 ¶ 6).

17  • During his new inmate evaluation, Nurse Thomas noted that Plaintiff takes over the

18  counter ibuprofen for pain control and has a high arch in his foot "for which he is using

19  custom made insoles." (Doc. No. 45-3 at 35-36).

20  • Nurse Thomas' treatment notes do not indicate that Plaintiff requested replacement

21  custom orthotic shoes or custom orthotic insoles in March 2019.  (Doc. No. 45-3 at 35-

22  36).

23  • On April 18, 2019, Plaintiff was evaluated by Dr. Nege for status post carpal and cubital

24  tunnel release. The treatment notes do not indicate that Plaintiff discussed his foot pain or

25  requested replacement custom orthotic footwear.  (Doc. No. 45-3 at 33-34).

26  • On July 9, 2019, Plaintiff filed a health care grievance in which he stated, "I have

27  repeatedly requested replacement of my ortopedic [sic] boots which are over a year

28  overdue but have not received them."  (Doc. No. 45-3 at 55).

11

1   • Following submission of his grievance, Plaintiff's feet were evaluated by Dr.
2     Montegrande on August 9, 2019.  (Doc. No. 45-3 at 38-39, 51-65; Doc. No. 45-4 at 2-3 ¶
3     5).
4   • During her evaluation, Dr. Montegrande noted that Plaintiff indicated that he required new
5     orthotic shoes because he had "bad feet."  Plaintiff further indicated that he did not
6     exercise but was able to walk wherever he needed to without issue.  Dr. Montegrande
7     examined Plaintiff's feet.  Based on this examination, Dr. Montegrande noted that
8     Plaintiff feet did not have any deformity, had "[n]ormal posterior tibial & dorsalis pedis
9     pulse . . . normal color & perfusion without atrophy of any muscle groups."  Dr.
10    Montegrande also noted that Plaintiff had a normal range of motion in both of his ankles.
11    (Doc. No. 45-3 at 38-39, 51-65; Doc. No. 45-4 at 3-4 ¶ 5).
12  • Based on these clinical findings, Dr. Montegrande determined that Plaintiff lacked a
13    medical need for custom orthotic shoes and custom orthotic insoles and denied his
14    request.  (Doc. No. 45-4 at 3 ¶ 6; Doc. No. 45-5 at 3 ¶ 8).
15  • August 9, 2019 was the only time that Dr. Montegrande treated Plaintiff.  (Doc. No. 45-4
16    at 2 ¶ 3; Miller Depo. Tr. at 62:8-11).
17  • Plaintiff's grievance regarding the delay in receiving custom orthotics was denied at the
18    institutional and headquarters levels of review.  (Doc. No. 45-3 at 51-65).
19  • As of August 2019, when Plaintiff was examined by Dr. Montegrande, he had not been
20    diagnosed with any condition that would require custom orthotics such as diabetes,
21    buerger's disease, or chronic thrombophlebitis.  (Doc. No. 45-3 at 38-39, 85-86).
22  • On September 4, 2019, Plaintiff was examined for the first time by Dr. Owolabi.  Plaintiff
23    does not remember the September 4, 2019 visit.  (Doc. No. 45-6 at 2-3 ¶ 7; Miller Depo.
24    Tr. at 60:17-61:3).
25  • According to Dr. Owolabi, Plaintiff's chief complaint for the September 4 visit was to
26    follow up regarding his status post carpal/cubital tunnel release.  During this exam,
27    Plaintiff discussed controlled chronic neck pain, allergic rhinitis, and his status post carpal
28    tunnel surgery in both wrists.  Plaintiff did not discuss foot pain or request replacement

12

1    custom orthotic boots or insoles during the September 4, 2019 visit.[4]  (Doc. No. 45-6 at 2-

2    3 ¶ 7).

3    •  Had Plaintiff requested replacement custom orthotic boots or custom orthotic insoles, Dr.

4        Owolabi would have included that request in his progress notes. (Doc. No. 45-6 at 2-3 ¶

5        7).

6    •  During the September 4 exam, Dr. Owolabi noted that Plaintiff had normal gait and range

7        of motion.  Dr. Owolabi prescribed Plaintiff Sulindac, an NSAID used to treat pain,

8        inflammation, and arthritis symptoms, as treatment for pain related to Plaintiff's carpal

9        tunnel.  While the Sulindac was not prescribed for foot pain, the medication would also

10       help to relieve any foot pain Plaintiff was experiencing.  (Doc. No. 45-6 at 2-3 ¶ 7).

11   •  On January 14, 2020, Plaintiff was also evaluated for orthotics by Family Nurse

12       Practioner ("FNP") Mansarah.  At that time, Plaintiff did not meet the criteria for custom

13       orthotic footwear, and a prescription for custom orthotics was not provided.  During the

14       January 14 evaluation, Plaintiff noted that he had foot pain if he wore standard state issued

15       shoes but that the pain did not affect his walking or prevent him from going to his

16       program and activities.  FNP Mansarah described Plaintiff's feet as "good arch, no

17       swelling or deformities, no ankle/joint swelling, no discolorations, sensations intact, walks

18       with normal gait, no skin dryness or break down, no discolorations."  FNP Mansarah also

19       noted that Plaintiff's custom orthotic boots were still in wearable condition and that he

20       was permitted to wear personal shoes wherever permitted by custody staff.  (Doc. No. 45-

21       5 at 4-5 ¶ 11; Doc. No. 45-3 at 44-45).

22   •  Dr. Owolabi continued to treat Plaintiff until his release on parole in January 2022.

23       Between September 2019 and January 2022, Dr. Owolabi treated Plaintiff nineteen times

24       for various health conditions.[5]  (Doc. No. 45-6 at 3-5 ¶ 9; Doc. No. 45-3 at 89-144).

25   _____

26   [4] Although Dr. Owolabi's declaration states "Plaintiff did not discuss foot pain" during the September 4,
     2019 exam and progress note from that date does not list foot pain under the "Chief Complaint" heading,
     the Court observes that the "Problem List/Past Medical History" portion of the same record identifies foot
27   pain as an "ongoing" condition.  (Doc. No. 45-6 at 2-3 ¶ 7; Doc. No. 45-3 at 41-42).
     [5] During these nineteen evaluations, the Court notes that numerous progress notes identify foot pain as an
28   "ongoing" condition within the "Problem List/Past Medical History."  (See Doc. No. 45-3 at 89-144).

1   • On October 28, 2019, Dr. Owolabi treated Plaintiff for carpal tunnel syndrome and
2   cataracts.  (Doc. No. 45-6 at 3-5 ¶ 9(a); Doc. No. 45-3 at 89-90).

3   • On October 7, 2020, Dr. Owolabi treated Plaintiff for carpal tunnel syndrome, glaucoma,
4   and cataracts.[6]  (Doc. No. 45-6 at 3-5 ¶ 9(b); Doc. No. 45-3 at 92-93).

5   • On December 21, 2020, Dr. Owolabi treated Plaintiff for cataracts. (Doc. No. 45-6 at 3-5
6   ¶ 9(c); Doc. No. 45-3 at 95-96).

7   • On December 28, 2020, Dr. Owolabi treated Plaintiff for cataracts and glaucoma. (Doc.
8   No. 45-6 at 3-5 ¶ 9(d); Doc. No. 45-3 at 98-99).

9   • On March 2, 2021, Dr. Owolabi treated Plaintiff for neck pain and cataracts. (Doc. No.
10  45-6 at 3-5 ¶ 9(e); Doc. No. 45-3 at 101-102).

11  • On March 23, 2021, Dr. Owolabi treated Plaintiff for follow up following care by an
12  ophthalmologist. (Doc. No. 45-6 at 3-5 ¶ 9(f); Doc. No. 45-3 at 104-105).

13  • On April 1, 2021, Dr. Owolabi treated Plaintiff for cataracts and scrotal pain.  (Doc. No.
14  45-6 at 3-5 ¶ 9(g); Doc. No. 45-3 at 107-108).

15  • On May 11, 2021, Dr. Owolabi treated Plaintiff for follow up care following cataract
16  surgery.  (Doc. No. 45-6 at 3-5 ¶ 9(h); Doc. No. 45-3 at 110-111).

17  • On May 19, 2021, Dr. Owolabi treated Plaintiff for follow up care following a visit with
18  an ophthalmologist. (Doc. No. 45-6 at 3-5 ¶ 9(i); Doc. No. 45-3 at 113-114).

19  • On May 25, 2021, Dr. Owolabi treated Plaintiff for vision problems and a request for a
20  podiatry referral.  (Doc. No. 45-6 at 3-5 ¶ 9(j); Doc. No. 45-3 at 116-117.

21  • On June 3, 2021, Dr. Owolabi treated Plaintiff for vision problems in his left eye. (Doc.
22  No. 45-6 at 3-5 ¶ 9(k); Doc. No. 45-3 at 119).

23  • On June 8, 2021, Dr. Owolabi treated Plaintiff for follow up care related to care from an
24  ophthalmologist.  (Doc. No. 45-6 at 3-5 ¶ 9(l); Doc. No. 45-3 at 121-122).

25  • On June 22, 2021, Dr. Owolabi treated Plaintiff for follow up care following a consult

26

27  [6] Dr. Owolabi's October 7, 2020 Progress Note appears to note foot pain under "Assessment/Plan" and
    contains an incomplete notation under the "Chief Complaint" section stating only: "need new ortho boots.
28  He states the." (Doc. No. 45-3 at 92).

with an ophthalmologist.  (Doc. No. 45-6 at 3-5 ¶ 9(m); Doc. No. 45-3 at 124-125).

- On June 28, 2021, Dr. Owolabi treated Plaintiff for follow up care following a consult with an ophthalmologist.  (Doc. No. 45-6 at 3-5 ¶ 9(n); Doc. No. 45-3 at 128).

- On July 12, 2021, Dr. Owolabi treated Plaintiff for follow up care following a visit with an ophthalmologist.  (Doc. No. 45-6 at 3-5 ¶ 9(o); Doc. No. 45-3 at 130-131).

- On July 21, 2021, Dr. Owolabi treated Plaintiff for a detached retina. (Doc. No. 45-6 at 3-5 ¶ 9(p); Doc. No. 45-3 at 133-134).

- On August 19, 2021, Dr. Owolabi treated Plaintiff for follow up care following a visit with an ophthalmologist.  (Doc. No. 45-6 at 3-5 ¶ 9(q); Doc. No. 45-3 at 136-138).

- On September 28, 2021, Dr. Owolabi treated Plaintiff for follow up care following treatment by an ophthalmologist.  (Doc. No. 45-6 at 3-5 ¶ 9(r); Doc. No. 45-3 at 140-141).

- On December 29, 2021, Dr. Owolabi treated Plaintiff for follow up care following a visit with an ophthalmologist.  (Doc. No. 45-6 at 3-5 ¶ 9(s); Doc. No. 45-3 at 143-144).

- According to Dr. Owolabi, the only visit where Plaintiff discussed his foot pain with Dr. Owolabi was May 25, 2021. (Doc. No. 45-6 at 5 ¶ 10; Doc. No. 45-3 at 116-117).

- The May 25, 2021, visit occurred after Plaintiff filed this lawsuit on September 2, 2020. (Doc. No. 1).

- During the May 25, 2021 visit, Plaintiff requested a referral to podiatry for replacement custom orthotic shoes and insoles.  At that time, Dr. Owolabi examined Plaintiff's existing pair of custom orthotic boots and noted that they were not worn out.  Additionally, Dr. Owolabi informed Plaintiff that he would order a replacement over-the-counter orthotic insole for Plaintiff's orthotic boots.  (Doc. No. 45-6 at 5 ¶ 10; Doc. No. 45-3 at 116-117).

- Plaintiff refused the offered over-the-counter orthotic insoles.  (Doc. No. 45-6 at 5 ¶ 10; Doc. No. 45-3 at 67-69, 116-117).

- In Dr. Lotersztain's opinion, Dr. Owolabi's decision to issue an over-the-counter insole was an appropriate remedy for foot pain. (Doc. No. 45-5 at 5 ¶ 12).

- In Dr. Lotersztain's opinion, at no point was Dr. Owolabi deliberately indifferent to Plaintiff's serious medical needs during his treatment of Plaintiff.  (Doc. No. 45-6 at 5-6 ¶

15

1    11).

2    • In Dr. Lotersztain's opinion, at no point was Dr. Montegrande deliberately indifferent to

3    Plaintiff's serious medical needs during her treatment of Plaintiff.  (Doc. No. 45-4 at 3 ¶

4    6).

5    • Since his release from custody, Plaintiff currently wears over-the-counter insoles that he

6    gets from Walmart after stepping on a machine that examines his foot and recommends

7    the correct size insole.  (Miller Depo. Tr. at 75:2-13).

8    • Since his release from custody, Plaintiff has not been prescribed custom orthotic shoes or

9    insoles. (Miller Depo. Tr. at 77:3-7).

10   • Since 2019, Plaintiff has not been diagnosed with any worsened medical condition

11   because of being denied replacement custom orthotic shoes and custom orthotic insoles.

12   (Miller Depo. Tr. at 72:6-19).

13   • Plaintiff's foot pain has not increased since 2015, when he first received custom orthotics.

14   (Miller Depo. Tr. at 71:20-72:5).

15   **C. Eighth Amendment Medical Deliberate Indifference**

16   The Court first must consider whether Defendants, as the moving party, have met their

17   initial burden of showing *prima facie* entitlement to summary judgment on the issue of Plaintiff's

18   medical deliberate indifference claim.  *Celotex Corp.*, 477 U.S at 323.  The *prima facie* elements

19   of medical deliberate indifference are (1) a "serious medical need[,] [where] failure to treat a

20   prisoner's condition could result in further significant injury or the unnecessary and wanton

21   infliction of pain" and (2) the defendant's "response to the need was deliberately indifferent."

22   *Wilhelm*, 680 F.3d at 1122 (internal quotation marks and citation omitted).  The second prong is

23   satisfied by showing "(a) a purposeful act or failure to respond to a prisoner's pain or possible

24   medical need and (b) harm caused by the indifference."  *Jett*, 439 F.3d at 1096 (internal citations

25   omitted).

26   **1.  Serious Medical Need**

27   Defendants do not argue that Plaintiff had a serious medical need.  The record reflects that

28   on December 10, 2015, Plaintiff was prescribed custom orthotic shoes and custom orthotic insoles

16

1    by Dr. A. Chen as treatment for nodules in the soles of Plaintiff's feet that were likely caused by

2    Morton's neuroma.  (Doc. No. 45-5 at 3-4 ¶ 9; Miller Depo. Tr. at 35:23-25, Doc. No. 45-3 at 47).

3    Although Plaintiff did not specifically report to Defendants any degree of discomfort or pain

4    during the relevant period, the medical records reflects that he had ongoing history of foot pain.

5    (*See* Doc. No. 45-3 at 89-144); *see also Hollis v. Lee*, 2007 WL 963319, at *7 (N.D. Cal. Mar. 30,

6    2007) (finding triable issue of fact as to whether the plaintiff's foot pain constituted a serious

7    medical need when the plaintiff's doctor previously prescribed orthotics), *aff'd sub nom. Hollis v.*

8    *Barrie*, 321 F. App'x 677 (9th Cir. 2009); *Lopez v. Scribner*, 2007 WL 184831, at *9 (E.D. Cal.

9    Jan. 23, 2007) (finding triable issue of fact as to whether the plaintiff's foot condition constituted

10   a serious medical need where the plaintiff had been prescribed orthotics dating back to 1993),

11   *report and recommendation adopted*, 2007 WL 781432 (E.D. Cal. Mar. 13, 2007).  Thus, for

12   purposes of evaluating Defendants' MSJ, the Court assumes that Plaintiff's foot condition

13   consitutes a serious  medical condition.

14                    **2.  Deliberate Indifference**

15        Turning to the second prong, the Court examines whether three are any questions of

16   material facts as to whether Dr. Owolabi or Dr. Montegrande Defendants acted with deliberate

17   indifference to Plaintiff's serious medical need by denying him Plaintiff replacement orthotic

18   shoes or insoles for his foot condition.

19                    **a.  Dr. Owolabi**

20        Dr. Owolabi first examined Plaintiff on September 4, 2019.  (Doc. No. 45-6 at 2-3 ¶ 7;

21   Miller Depo. Tr. at 60:17-61:3).  Plaintiff does not recall attending this appointment.  (*Id*.).  The

22   purpose of the September 4 visit was for a follow up regarding Plaintiff's status post carpal/

23   cubital tunnel release.  (*Id*)  At this visit, Plaintiff described ongoing controlled chronic neck

24   pain, allergic rhinitis, and previously undergone bilateral carpal tunnel procedures.  (Doc. No. 45-

25   6 at 2-3 ¶ 7; Doc. No. 45-3 at 41-42).  Although foot pain is listed in the "Problem List/Past

26   Medical History" portion of the September 4 progress note, Plaintiff did not discuss foot pain or

27   request replacement custom orthotic boots or insoles during this visit.  (*Id*.).  During this exam,

28   Dr. Owolabi noted that Plaintiff had normal gait and range of motion.  (*Id*.).

1    Between September 2019 and Plaintiff's release from custody in January 2022, Dr.

2    Owolabi treated Plaintiff nineteen times for various health conditions.  (Doc. No. 45-6 at 3-5 ¶ 9;

3    Doc. No. 45-3 at 89-144).  Although foot pain is listed as an "ongoing" condition within the

4    "Problem List/Past Medical History" during this period, the only visit where Plaintiff expressly

5    discussed his foot pain with Dr. Owolabi was on May 25, 2021.  (Doc. No. 45-6 at 5 ¶ 10).  The

6    Court notes that in Dr. Owolabi's October 7, 2020 Progress Note, Plaintiff states his "Chief

7    Complaint" as  "need new ortho boots,"  under the "Assessment/Plan" section for "Foot pain" it

8    states: "encouraging physical stretch exercise, and walking, and avoid long standing."  (Doc. No.

9    45-3 at 92).

10    Assuming Plaintiff first raised concerns regarding foot pain or a need for orthotics with

11    Dr. Owolabi on either October 7, 2020 or May 25, 2021, Dr. Owolabi is entitled to summary

12    judgment.   Plaintiff filed his Complaint on September 2, 2020, alleging Defendants ignored his

13    repeated requests for replacement orthotics.  (Doc. No. 1 at 8 ¶ 7; *see also* Doc. No. 45-3 at 55).

14    The Complaint was filed prior to either of these clinical encounters with Dr. Owolabi.  Thus, Dr.

15    Owolabi could not have plausibly participated in the events underlying Plaintiff's allegations.

16    *See O'Keefe v. Brown*, 2016 WL 4000931, at *9 (E.D. Cal. July 25, 2016) (holding that

17    allegations concerning events occurring after the filing of plaintiff's amended complaint may not

18    supplement the pleadings through opposition briefing and may not be considered at the summary

19    judgment stage), *report and recommendation adopted*, 2017 WL 4325778 (E.D. Cal. Sept. 29,

20    2017).  To prevail on a claim under § 1983, a plaintiff must demonstrate: (1) the violation of a

21    federal constitutional or statutory right; and (2) that the violation was committed by a person

22    acting under the color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Jones v. Williams*,

23    297 F.3d 930, 934 (9th Cir. 2002).  An individual defendant is not liable on a civil rights claim

24    unless the facts establish either the defendant's personal involvement in the constitutional

25    deprivation or a causal connection between the defendant's wrongful conduct and the alleged

26    constitutional deprivation.  *See Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989); *Johnson v.*

27    *Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978).

28    Because the undisputed record reflects that Plaintiff first notified Dr. Owolabi of his foot

1  pain or requested replacement orthotics on either October 7, 2020 or May 25, 2021—both dates

2  postdating the filing of the Complaint—there is no genuine dispute of material fact regarding Dr.

3  Owolabi's lack of personal involvement or causal nexus with the alleged constitutional violation.

4  *See O'Keefe v. Brown*, 2016 WL 4000931, at \*9 (E.D. Cal. July 25, 2016) ("[B]ecause plaintiff

5  appears to base defendant Wynn's liability on events occurring after he filed the fifth amended

6  complaint, defendant Wynn should be granted summary judgment on the grounds that plaintiff

7  has not demonstrated Wynn's involvement in the alleged deprivations.").  Thus, the undersigned

8  recommends granting summary judgment as to Dr. Owolabi.

9  **b. Dr. Montegrande**

10  As to Dr. Montegrande, Plaintiff testified, "She didn't do anything. That's the problem."

11  (Miller Depo. Tr. at 80:22-81:1).  However, the Court finds that Dr. Montegrande was not

12  deliberately indifferent to Plaintiff's serious medical condition because the undisputed facts

13  establish that her treatment was medically acceptable under the circumstances when conducting

14  her own independent evaluation of Plaintiff.

15  Dr. Montegrande evaluated Plaintiff's feet on August 9, 2019, which was the only

16  occasion she attended to Plaintiff.  (Doc. No. 45-3 at 38-39; Doc. No. 45-4 at 2-3 ¶¶ 3, 5; Miller

17  Depo. Tr. at 62:8-11).  During her evaluation, Dr. Montegrande documented Plaintiff's statement

18  that he needed new replacement orthotic shoes due to "bad feet." (Doc. No. 45-3 at 38-39; Doc.

19  No. 45-4 at 3-4 ¶ 5).  Plaintiff further reported that he did not exercise but was able to ambulate

20  wherever necessary without limitation.  (*Id*.).  Upon physical examination, Dr. Montegrande

21  found no foot deformities, and noted intact posterior tibial and dorsalis pedis pulses, normal

22  coloration and perfusion, and no muscle atrophy.  (*Id*.).  She also observed full ankle range of

23  motion.  (*Id*.).  Based on these clinical findings, Dr. Montegrande concluded that Plaintiff did not

24  present a medical need for custom orthotic footwear and denied his request.  (Doc. No. 45-4 at 3 ¶

25  6; Doc. No. 45-5 at 3 ¶ 8).  Plaintiff's own testimony corroborates that Dr. Montegrande

26  immediately conducted her own independent evaluation of Plaintiff's foot once he requested new

27  orthotics and, shortly thereafter, provided Plaintiff with an explanation as to why he did not

28  qualify for new orthotics.  (Miller Depo. Tr. at 66:17–67:1, 80:15-21).

The undisputed record evidence reveals that Plaintiff was merely unsatisfied with Dr. Montegrande's independent evaluation, which determined that Plaintiff did not meet the criteria for a new orthotics referral.  *See Toguchi*, 391 F.3d at 1058 ("a mere difference of medical opinion is insufficient . . . to establish deliberate indifference" (cleaned up)).  Further, assuming the existence of an orthotics order prior to his transfer to CCI in February 2019, Plaintiff failed to provide any evidence to support that a prior medical treatment cannot be rescinded or changed.  *See, e.g., Washington v. Rouch*, 2018 WL 3770203, at *7 (E.D. Cal. Aug. 7, 2018) ("The undisputed evidence is that even accommodations designated as 'permanent' are subject to review and possible modification or rescission."), *aff'd*, 771 F. App'x 832 (9th Cir. 2019).

Nonetheless, the pivotal question of this case is whether a defendant's "chosen course of treatment was medically unacceptable under the circumstances, and was chosen in conscious disregard of an excessive risk to the prisoner's health." *See Toguchi*, 391 F.3d at 1058 (cleaned up).  Plaintiff failed to put forth any evidence raising an issue of material fact regarding Defendants' denial of new orthotics and whether it was medically unacceptable under the circumstances.  Rather, the undisputed facts support the opposite conclusion.  Notably, during their separate evaluations, Dr. Montegrande, Dr. Owalabi, and nonparty Family Nurse Practioner ("FNP") Mansarah, each concluded that Plaintiff did not meet the criteria for new orthotics.  (Doc. No. 45-3 at 38-39, 44-45, 116-117).

On January 14, 2020, Plaintiff was evaluated for orthotics by FNP Mansarah.  (Doc. No. 45-5 at 4-5 ¶ 11; Doc. No. 45-3 at 44-45).  At that time, Plaintiff did not meet the criteria for custom orthotic footwear, and a prescription for custom orthotics was not provided.  (*Id.*). During the January 14 evaluation, Plaintiff noted that he had foot pain if he wore standard state issued shoes but that the pain did not affect his walking or prevent him from going to his activities. (*Id.*).  FNP Mansarah described Plaintiff's feet as "good arch, no swelling or deformities, no ankle/joint swelling, no discolorations, sensations intact, walks with normal gait, no skin dryness or break down, no discolorations." (*Id.*).  FNP Mansarah also noted that Plaintiff's custom orthotic boots were still in wearable condition and that he was permitted to wear personal shoes wherever permitted by custody staff.  (*Id.*).

During the May 25, 2021 visit with Dr. Owalabi, Plaintiff requested a replacement custom orthotic shoes and insoles. (Doc. No. 45-6 at 5 ¶ 10; Doc. No. 45-3 at 116-117).  At that time, Dr. Owolabi examined Plaintiff's existing pair of custom orthotic boots and noted that they were not worn out.  (*Id*.).  Additionally, Dr. Owolabi informed Plaintiff that he would order a replacement over-the-counter orthotic insole for Plaintiff's orthotic boots.  (*Id*.).  Plaintiff refused the offered over-the-counter orthotic insoles.  (Doc. No. 45-3 at 67-69).

These evaluations, which occurred independently from each other, reflect that Defendants made a medical determination only after examining Plaintiff's feet and the condition of his current orthotic shoes and insoles and finding that replacement orthotic shoes were not medically indicated.  Further, Defendants proffer the declaration of Dr. Lotersztain, the Chief medical Officer, who reviewed the August 9, 2019 medical notes from Dr. Montegrande regarding her decision to deny Plaintiff's request for replacement custom orthotic shoes and insoles. (Doc. No. 45-5 at 3, ¶ 8).  Dr. Lotersztain opined that Dr. Montegrande's decision was medically appropriate because Dr. Montegrande's  findings that Plaintiff did not have any deformity to either foot, had normal posterior tibial & dorsalis pedis pulse on both of his feet, normal color and perfusion without any atrophy, and that both of his ankle joints had a normal range of motion, indicated that orthotics would not be medically appropriate.  Thus, the Court finds no evidence to support a triable issue as to whether Defendant Montegrande was  deliberately indifferent to Plaintiff's serious medical needs when she did not reorder replacement orthotics for Plaintiff.  *See Washington*, 2018 WL 3770203, at *8 (granting summary judgment in favor of the defendants who rescinded and denied the plaintiff's permanent chrono for orthopedic shoes).

### D.  Qualified Immunity

In the alternative, Defendants assert that they are entitled to qualified immunity in this case because no official in their position would believe that their conduct in denying orthotics violated Plaintiff's constitutional rights under the circumstances.

A government official is entitled to qualified immunity under Section 1983 unless (1) the official "violated a federal statutory or constitutional right, and (2) the unlawfulness of his conduct was 'clearly established at the time.'"  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589

1    (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *Harlow v. Fitzgerald*, 457 U.S.

2    800, 817 (1982).  To demonstrate that a right was "clearly established" requires a showing that

3    the statutory or constitutional question was "beyond debate," such that every reasonable official

4    would understand that what he is doing is unlawful.  *Wesby*, 138 S. Ct. at 589; *Vos v. City of*

5    *Newport Beach*, 892 F.3d 1024, 1035 (9th Cir. 2018).  This standard is "demanding" and protects

6    "all but the plainly incompetent or those who knowingly violate the law." *Wesby*, 138 S. Ct. at

7    589 (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "[A] court typically should identify a

8    case where an officer acting under similar circumstances as [the defendant] was held to have

9    violated the constitutional right at issue." *S.B v. County of San Diego*, 864 F.3d 1010, 1015 (9th

10   Cir. 2017)).  "Even when no case is 'directly on point,' courts may compare relevant factors to

11   determine whether every reasonable officer should have known the conduct in question was

12   unlawful." *Anderson v. Virga*, 2018 WL 1556806, *2 (E.D. Cal. Mar. 30, 2018) (citing *Isayeva v.*

13   *Sacramento Sheriff's Dep't*, 872 F.3d 938, 946–47 (9th Cir. 2017).  The plaintiff bears the burden

14   of establishing that the right alleged was clearly established.  *Moran v. Washington*, 47 F.3d 839,

15   844 (9th Cir. 1998).

16        As discussed *supra*, the Court finds the undisputed facts show that Defendants were not

17   deliberately indifferent to Plaintiff's serious medical needs.  Thus, because the Court finds no

18   constitutional violation, the Court need not address the second prong.

19        Accordingly, it is **RECOMMENDED**:

20        1.  The district court **GRANT** Defendants' Motion for Summary Judgment (Doc. No. 45).

21        2.  Judgment be entered in Defendants' favor and the case closed.

22                            **NOTICE TO PARTIES**

23        These Findings and Recommendations will be submitted to the United States District

24   Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

25   after being served with a copy of these Findings and Recommendations, a party may file written

26   objections with the Court.  *Id*.; Local Rule 304(b).  The document should be captioned,

27   "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen**

28   **(15) pages**.  The Court will not consider exhibits attached to the Objections.  To the extent a party

wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity.  Any pages filed in excess of the fifteen (15) page limitation may be disregarded by the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. § 636(b)(l)(C).  A party's failure to file any objections within the specified time may result in the waiver of certain rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

Dated:    July 31, 2025

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE